# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| TERESE R. JACKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15-cv-00670-NKL |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Terese Jacks appeals the Commissioner of Social Security's final decision denying her application for disability insurance and supplemental security income benefits. The decision is affirmed.

## I.      Background

Jacks alleges disability beginning February 1, 2011. She was born in 1959 and has a high school education. She worked for an insurance company for over 20 years in positions including receptionist, file clerk, and switchboard operator. During the same time frame, she also worked a second job at a clothing store as a salesperson for a few years. Jacks stopped working in 2009, and since then has been taking care of her homebound mother. In 2011, Jacks worked for about a month for a home health care agency, assisting a blind client. She stopped working there when the client died.

### A.      Medical history

Jacks saw a podiatrist in September 2010 about a reoccurring ganglion cyst and hammertoe on her left foot. She had corrective surgery in December 2010.

In September 2011, Jacks saw Ronald McAmis, D.D.S. at an oral-maxilofacial surgery clinic about jaw pain, reporting it had begun in May 2011 when her husband hit her in the face. She said she had throbbing pain in the upper left jaw, near her ear, that worsened with lying

down and when she opened her jaw. Imaging showed no fracture and normal findings. Dr. McAmis prescribed anti-inflammatories and muscle relaxants to relieve jaw pain and tightness.

Jacks saw Peter Shapiro, M.D., an otolaryngologist, in October 2011, complaining of pain in the left ear and wondering whether she had hearing loss. A hearing test showed normal results on both sides. The doctor's impression was that Jacks "did not sustain any injury to the ear and her hearing [was] good." [Tr. 310.] An MRI of the head performed on November 13, 2011 was "[e]ssentially normal[.]" [Tr. 308.]

Jacks saw Dr. Shapiro again on November 14, 2011, complaining of vertigo "when she gets up in the morning and sometimes when she lays down[.]" [Tr. 307.] The doctor performed the Hallpike maneuver, which was positive for "rotatory nystagmus with the right ear down[] [and] fatigued with repetition." [Tr. 307.] His impression was benign paroxysmal positional vertigo. The doctor instructed Jacks to perform Cawthorne's exercises three to four times a day over the next week and said her "dizziness would most likely get better." [*Id.*]

Jacks returned to Dr. Shapiro on December 22, 2011, complaining of continuing dizziness when she got in different positions and a lot of pain in front of her left ear. Under "Impression," Dr. Shapiro wrote, "This dizziness is very strange. It evidently happened after trauma…." [Tr. 306.] The doctor referred Jacks for an electronystagmogram (ENG)[1] to be performed the next day. The neurologist's impression was "[n]ormal ENG." [Tr. 305.]

In January 2012, Jacks saw Bartlomicj Nierzwicki, M.D., in an oral-maxillofacial surgery

---

[1]     "The ENG is used to detect disorders of the peripheral vestibular system (the parts of the inner ear that interpret balance and spatial orientation) or the nerves that connect the vestibular system to the brain and the muscles of the eye. The test may be performed if an individual is experiencing unexplained dizziness, vertigo, or hearing loss. Additional conditions in which ENG may be performed are acoustic neuroma, labyrinthitis, Usher syndrome, and Meniere's disease. If a known lesion exists this test can identify the actual site." http://www.hopkinsmedicine.org/healthlibrary/test_procedures/neurological/electronystagmography_eng_92,p07659/

2

clinic, with complaints of continued left-side facial pain. The doctor reviewed the September 2011 imaging. Noting Jacks had not been compliant with the previously-prescribed medication, the doctor "stressed" the "importance of" taking it as scheduled. [Tr. 326-327.]

In February 2012, Jacks saw Jason Day, M.D., a neurologist, complaining that she "develops spinning" and has daily headache, bilateral throbbing in the temporal area, pain in front of the left ear, and low-pitched ringing in the left ear. The doctor noted Jacks' divorce from her abuser would be final soon. Under Review of Symptoms, Dr. Day noted Jacks denied dizziness, lightheadedness, or syncope. [Tr. 335.] On exam, the doctor's findings included no acute distress; no disorders of cognition, comprehension, or concentration; full power in all four extremities; present and symmetrical reflexes throughout; and intact coordination, gait, balance, and tandem walk. [*Id.*] Under Assessment, the doctor listed post-traumatic headache, unspecified; unspecified vertiginous syndromes and labyrinthine disorders, and post-traumatic vestibulopathy of the left ear; hypothyroidism; and post-traumatic dizziness and giddiness. Dr. Day further stated,

> I believe Mrs. Jacks has a post traumatic vestibular disease as well as headache. Also known as post-traumatic dizziness and giddiness. Rarely in these cases, there can be actual anatomical damage to the semicircular canals. Also known as a canal dehiscence. The extensive ENG report shows that most of the study is normal which might mitigate against the dehiscence. However, if [a loud] noise truly causes oscillopsia, that could be features of dehiscence. Therefore I would like to get an MRI of her brain and an MRI of her temporal bone windows [with] special attention to the canals. I've also recommend the trial of Valium short course PRN and for dizziness. We will follow up in two months, from which will decide if she needs daily headache prevention…. In time, I do think she will get much better.

[Tr. 335.][2]  Dr. Day ordered an MRI and CT scan, prescribed Valium, and referred Jacks for

---

[2]    Superior canal dehiscence syndrome (SCDS) involves an abnormal opening in the uppermost canal of the vestibule of the inner ear. It may be caused by the bony surface of the canal not growing to its normal thickness during development, and in some cases, a head trauma may occur before symptoms appear. Symptoms of SCDS can include loss or distortion of

3

physical therapy for evaluation and treatment of post-traumatic vestibular disease.

At a two-month follow-up in April 2012, Dr. Day noted that the MRI and CT results showed no canal disorder. Jacks reported she still got dizzy when changing position, such as bending up or down, was intolerant of motion, and had occasional headaches. She said the Valium had "helped quite a bit." [Tr. 337.] She was willing to continue trying physical therapy. All findings on physical exam were normal, except Dr. Day noted "[v]estibular ocular reflex testing suggest[s] that there is a left hypo function labyrinth." [*Id.*] Dr. Day's assessment was unspecified vertiginous syndromes and labyrinthine disorders, post-traumatic vestibulopathy of the left ear; post-traumatic headache, unspecified; dizziness and giddiness; and post-concussion syndrome. Under Treatment, Dr. Day recommended continued use of Valium, noting, "I believe she still has a post-traumatic vestibular disease. Although there is no objective evidence by CT imaging of canal dehiscence, at some level she is having dysfunction. This is recapitulated by vestibular ocular reflex testing and history of present illness." [Tr. 338.] With respect to post-concussion syndrome, Dr. Day wrote,

> Ultimately, this is her primary diagnosis. I think the symptoms will improve once the medical legal dispute is resolved. At some level these patients in general are held back from ultimate recovery while there [are] unfinished legal issues. The resolution of these things will be therapeutic in its own right.

[*Id.*] The doctor continued Valium, added amitriptyline for headache prevention, and renewed the physical therapy referral.

At a follow up in June 2012, Jacks said she was still experiencing tenderness in front of

---

hearing external noises; enhanced hearing of noises transmitted through bone, such as one's voice or pulse; or vertigo triggered by loud noises, coughing, sneezing or straining. SDCS is diagnosed based on history, examination of the patient for characteristic eye movements evoked by sound and pressure stimuli, hearing tests and certain vestibular tests, and a CT scan of the inner ears (temporal bones). The main treatment for SDCS is surgery to close the hole in the superior canal.
http://www.hopkinsmedicine.org/otolaryngology/specialty_areas/otology/conditions/superior-canal-dehiscence-syndrome.html

her left ear, dizziness, and headaches.  She could not tolerate the amitriptyline.  Dr. Day reiterated the diagnoses of post-traumatic headaches; unspecified vertiginous syndrome and labyrinthine disorder; dizziness; and post-concussion syndrome.   He prescribed Valium and Elavil, and encouraged Jacks to get counseling for emotional support.  Dr. Day also opined that Jacks was disabled due to dizziness and headaches.

Jacks returned to Dr. Day in December 2012 for follow up, and he prepared a summary report for Jacks' primary care physician, James Gracheck, D.O.  Dr. Day wrote that Jacks' dizziness used to be more vertiginous, but was now more lightheadedness.  He noted Jacks still experienced dizziness throughout the day but it was tolerable and she was no longer using Valium.   She was in no acute distress.   His impression was hypertension, post-traumatic dizziness, and migraines.   Jacks' medications were hydrochlorothiazide for hypertension, Synthroid for hypothyroidism, and Vivactil for depression.  Dr. Day added, "I think she is getting better overall.  Ultimately once she has closure with [her] divorce proceedings, I think she will ultimately recover with minimal long-term residual symptoms."  [Tr. 476.]

Jacks had foot surgery again in December 2012 to remove a ganglion cyst and repair a hammertoe on the left side.  For several weeks post-surgery, Jacks continued to have significant foot swelling and the second metatarsal was not healing well.   In April 2013, her surgeon prescribed use of a bone-growth stimulator.  At a follow up appointment the next month, she continued to have a non-union fracture of the bone, with hypertrophy, notwithstanding use of the device.  She was directed to continue using the device and to limit her activities.  In June 2013, she felt her condition was the same.  But she admitted to the surgeon that she had not been following his directions.   The surgeon noted she was able to ambulate in tennis shoes, and recommended Jacks use the device and limit her activities.

In February 2013, Jacks had a follow up with Dr. Day, who sent a report to Dr. Gracheck. Dr. Day noted Jacks' complaints of depression, difficulty finding words and completing her

5

thoughts, constant left ear pain, and daily headaches with visceral symptoms. Physical exam showed Jacks was alert, had "[g]ood attention," had no vestibular ocular reflex abnormality, and had good gait and motor control. [Tr. 474.] Dr. Day's impression was poor hypertension control, poor headache control, and "continued vestibular condition stable." [*Id.*] He noted Jacks' headache symptoms were likely symptoms of migraines, continued the Valium prescription, and added Lyrica.

Jacks next followed up with Dr. Day in July 2013, and he prepared a report for Dr. Gracheck. Jacks reported that her divorce had become final and she still took care of her "very sick mother who has dementia." [Tr. 471.] She said she had recently tripped on the stairs when she became dizzy, and that her vertigo is spontaneous and lasted 10 minutes, and is sometimes associated with a headache. She said that her hearing in her left ear is always altered. Physical exam showed Jacks was alert, moved all extremities, and "did not [have] much nystagmus." [Tr. 472.] The doctor's impression was recalcitrant vertigo with auditory disturbance, depression, anxiety, and headache. He noted that of the 40 minutes he spent with Jacks, more than half of the time was focused on counseling. He planned to refer Jacks to an ear, nose and throat specialist to rule out Méniéres disease. The doctor concluded by noting he had encouraged Jacks to maintain active primary care. He further noted, "She is still very disabled from this vestibular dysfunction. Although there is a lot of stress contributing, I'm not sure I can make better enough to be [] full-time employed." [*Id.*] He also ordered an MRI.

In July 2013, Jacks had an MRI of her brain, and the results were unremarkable. She also had an MRI of her cervical spine, which showed some degenerative changes. Later the same month, she saw Joseph Guastello, M.D., an ENT, complaining of positional vertigo and intermittent jaw pain on the left side. She had no complaint of hearing loss or ringing. All findings on physical exam were normal, except for tenderness over the left temporomandibular joint, and an audiogram showed normal hearing. The doctor's assessment was benign

6

paroxysmal positional vertigo.  Under Plan, the doctor noted, "Vestibular exercises and time.  I think most of the pain is TM joint related."  [Tr. 370.]

Jacks next saw Dr. Day in October 2013, and he prepared a report for Dr. Gracheck. Jacks reported headaches every other day, waking up with visual disturbance one morning, and tinnitus in the left ear, which Valium helped.  She said she had fallen recently on her right elbow "because she was imbalanced."  [Tr. 469.]  She also said the ENT had concurred that there was some potential hearing difficulty.  Physical exam showed Jacks was alert, moved all extremities, and had right elbow soreness but full range of motion.  Dr. Day reviewed the MRI of Jacks' brain and concluded the study was normal.  His impression was stable migraine; recurrent vertigo; stable depression; worsening hypertension; and vertigo-induced fall.  He prescribed Verapamil for migraine; suggested melatonin for headache prevention; and continued Valium for anxiety and as a vestibular suppressant.  Dr. Day also "fill[ed] out the form for a wheelchair placard for her parking given her vestibular symptoms and limited ambulatory abilities." [Tr. 470.]

Dr. Day saw Jacks again in June 2014, and he prepared a report for Dr. Gracheck. Dr. Day noted Jacks had been hospitalized in February 2014 for pneumosepsis, and that Jacks had moved her mother to assisted living because Jacks could no longer care for her, due to Jacks' "pre-existing and new illness[.]"  [Tr. 489.]  He wrote that Jacks still had left-ear hearing loss, and episodic headaches with potentially migrainous visual disturbances.  Dr. Day also wrote, "Her depression is stable.  Overall her vertigo has improved."  [*Id.*]  He added, "She's been unable to work because of ongoing headache and balance problems.  These problems are permanent and have an objective cause."  [*Id.*]  Dr. Day's impressions included: "Post concussive vestibular disease: Permanent"; "Episodic migraines:  Stable"; and "Depression: Stable."  [Tr. 490.]  He prescribed Elavil for depression, and Jacks was continued on hydrochlorothiazide and Synthroid.

7

## B.    Treating physicians' opinion, and other opinion evidence

Jacks was examined by two consultants in January 2012 at the request of the state agency. Alan Israel, Ph.D., performed a consultative psychological examination. Jacks told Dr. Israel that the primary reason she cannot work is physical symptoms including dizziness, difficulty hearing, and increased problems with her hands. He opined that Jacks had no mental impairments that would interfere with her ability to understand and remember instructions, persist and concentrate on tasks, interact socially, or adapt to a work-related environment. [Tr. 631-33.]

Kala Danushkodi, M.D., performed a consultative medical examination. Jacks reported that she was able to perform all activities of daily living, including caring for her mother who had Alzheimer's disease. Jacks did not have any trouble getting on and off the exam table. Range of motion in all extremities was normal. She had some tenderness and swelling in the hands but was able to make a fist and open her fingers without difficulty. Jacks had lumbosacral paraspinal tenderness with normal lumbar flexion and extension, and her pain was aggravated with lumbar range of motion. She could heel-to-toe walk without difficulty. Dr. Danushkodi diagnosed low back pain, right cervical radiculopathy, and left temporomandibular joint dysfunction. The doctor opined Jacks had no restrictions in sitting, walking, standing, hearing, speaking, traveling, or vision, and estimated she could lift 20 pounds. Due to Jacks' positional vertigo, the doctor opined that Jacks should avoid unsupported heights and climbing. [Tr. 638-39.]

Dr. Gracheck, Jacks' primary care physician, completed physical and mental health check-box forms on February 3, 2014. He opined that Jacks was limited to lifting and carrying less than 10 pounds, and sitting, standing, or walking less than two hours apiece. He opined that Jacks would need to be able to change positions at will, and should avoid twisting, bending, crouching, and climbing ladders. He further opined that her balance was impaired, and she

8

would have constant deficits in attention and concentration. Finally, he opined that Jacks was markedly impaired in her activities of daily living, social functioning, and concentration, persistence, or pace, and would miss work more than four days per month due to her conditions. Dr. Gracheck listed diagnoses of polyarthralgia, degenerative disc disease, degenerative joint disease, anxiety, and depression. He wrote that Jacks had chronic, constant pain. He also wrote that Jacks' anxiety and depression were chronic, and had begun in 2008. [Tr. 419-23.]

Two weeks later, on February 17, 2014, Dr. Gracheck prepared a letter in which he opined that Jacks' "most persistent medical problem is chronic vestibular dysfunction caused by closed head trauma." [Tr. 495.] He stated he last saw Jacks on February 13, 2014, and "at that time she was still having chronic daily episodes of extreme dizziness which prevent[] her from driving or operating machinery. She also complains of daily episodes of severe headaches." [Id.] Dr. Gracheck listed diagnoses of: chronic vestibular dysfunction secondary to closed head trauma; post-concussion syndrome with chronic cephalgia; post-traumatic stress disorder with chronic anxiety and depression; and degenerative joint disease of the extremities. [Id.] He opined that the damage to Jacks' head and ear was permanent and the condition was "without hope of resolution." [Id.]

Dr. Day, Jacks' neurologist, completed a physical health questionnaire dated June 6, 2014. [Tr. 492-93.] He opined that Jacks could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for two hours in an eight-hour work day and sit for four hours in a four-hour work day; and would need to be able to shift at will between sitting, standing, and walking. Dr. Day further opined that due to vestibular imbalance, Jacks could only occasionally twist, bend, and climb stairs; should avoid crouching and climbing ladders; and would be limited in reaching overhead. Finally, he opined that Jacks would frequently experience deficits in attention and concentration, even when performing simple tasks, and would likely miss more than four days of work per month due to her impairments or the need to obtain treatment for

those impairments.

Albert Orr, M.D., a neurosurgeon, testified on June 9, 2014 as a non-examining expert. [Tr. 48-59.]  Among other things, Dr. Orr noted Jacks was seen in 2011 by Dr. Shapiro, the otolaryngologist, who performed a test that was positive for benign paroxysmal vertigo, instructed Jacks to do certain exercises for vertigo three to four times a day, and felt the dizziness would improve.  Dr. Orr noted that nothing in the record demonstrated Jacks had done the exercises.  He also noted the records did not provide details of Jacks' head trauma, such as duration or whether there was loss of consciousness. Dr. Orr opined that Jacks was likely suffering from post-concussion syndrome with very mild paroxysmal vertigo.  He believed the dizziness was related to post-concussion syndrome and not to actual damage to the vestibular nerve or brain stem.  He noted that no brain injury was demonstrated on any scan, and testing for vestibular ear functioning was all completely normal.  He felt that the physical limitations Dr. Day identified were "purely on the basis of emotional problem[s] and not so much physical findings."  [Tr. 58.]  For example, he said, "there is nothing in the chart concerning [Jacks'] inability to walk.  At least, Dr. Day does not note any difficulty with her walking on his examinations."  [*Id.*]  Dr. Orr continued, "I don't know why she couldn't sit for long periods of time."  [*Id.*]  He did note that "[w]ith [Jacks'] episodic dizziness from her post[-concussion] syndrome, she may have some difficulty with prolonged walking or changing positions frequently[.]"  [Tr. 58-59.]  Overall, Dr. Orr could not identify medical findings in the record supporting the extreme limitations Drs. Gracheck and Day found.

## C.  Jacks' self-reports and hearing testimony, and other hearing testimony

Jacks filled out an Adult Function Report form in November 2012.  She wrote that her daily activities consisted of taking care of her mother who was 80 years old, had Alzheimer's disease, and needed 24-hour care.  Jacks wrote that she had pain in her hands from time to time and could not bend down due to vertigo.  She prepared meals daily and had not had any changes

in her cooking habits; and cleaned and did laundry.  She drove a car, regularly went to church, and could go out alone, shop in a store, and handle her own money.  She could follow written and spoken instructions "okay."  [Tr. 253.] Where the form asks a claimant to circle activities affected by the allegedly disabling conditions, Jacks circled only lifting and hearing, and not other options listed on the form such as bending, walking, sitting, concentration, and using the hands.  [*Id.*]

Jacks testified at the hearing of February 18, 2014.  When asked by the ALJ why she could not work now, Jacks answered, "Because I have arthritis and I can't even hardly hold a glass without dropping it.  I have rheumatoid arthritis in my knuckles and my thumb and I have to wear this brace."  [Tr. 33.]  Her attorney then asked her about dizziness.  Jacks testified that she had had dizziness since being struck in the face by her husband, and will "pass out if [she is] holding [her] head down or walks the wrong way[,]" which she said "happens every other day just about[.]"  [Tr. 34.]  She also testified that she "[s]ometimes" gets dizzy when she is "coming down the steps" or lies down with her "head a certain way."  [Tr. 35.]  She said she gets dizzy "[m]ost every day."  [Tr. 35.]  She also said she has pain and a knot in her left foot, and standing on it for long periods of time makes the pain worse.  [Tr. 36-37.]  Jacks did not mention headaches.  She did not mention medications she had taken and their effect.  Apart from the bone stimulator device prescribed after the 2012 foot surgery, she did not mention therapies she had tried for any of her conditions, such as the prescribed vertigo exercises.

A vocational expert also testified at the hearing.  [Tr. 37-41.]  The VE explained that Jacks' past relevant work as a file clerk and retail salesperson are light exertional level, and receptionist and switchboard operator are sedentary exertional level.  The ALJ proposed a hypothetical individual of Jacks' age, education, and work experience, and capable of light work with the following limitations:  can lift, carry, push, and pull 20 pounds occasionally, and 10 pounds frequently; cannot climb ropes, ladders, or scaffolds; cannot work around unprotected

heights; cannot work around hazards or open bodies of water; cannot operate foot controls; can stand and walk six hours in an eight-hour work day, and sit six hours of an eight-hour work day. The VE testified that an individual with these limitations could perform Jacks' prior work as a receptionist, switchboard operator, file clerk, and sales person. The VE further testified that the limitations on the light work would make 85 to 95% of the light jobs appropriate. Jacks' attorney proposed an additional limitation of having four or more unscheduled absences from work per month, and the VE testified no jobs would be available.

### D. The ALJ's decision

The ALJ found Jacks has severe impairments of generalized arthritis and degenerative joint disease of the lumbar spine. The ALJ concluded Jacks did not meet any Listings, including 1.02, major dysfunction of a joint, or 1.04, disorders of the spine, nor did Jacks contend below that she met any Listings.

The ALJ found Jacks has the residual functional capacity to perform:

> [L]ight work as defined in 20 CFR 404.1567(b) and 416.967(b), including the ability to lift and carry up to 10 pounds frequently, and 20 pounds occasionally, stand and/or walk for 6 hours in an 8 hour day, and sit for 6 hours in an 8 hour day. The claimant cannot climb ladders, ropes or scaffolds, be at unprotected heights or around hazards, and cannot use foot controls.

[Tr. 15.]

The ALJ concluded that Jacks' allegations were not entirely credible, and gave Dr. Orr's opinion great weight and Jacks' treating physicians' opinions little weight.

The ALJ found Jacks can perform all of her past relevant work as a file clerk and retail salesperson, which are classified as light work, and receptionist and switchboard operator, which are sedentary. Such jobs exist in significant numbers in the national economy, notwithstanding that 85% of the base would remain after accounting for the limitations provided in the RFC. [Tr. 37-39.]

The ALJ concluded Jacks is not disabled.

## II.     Discussion

Jacks argues that the ALJ did not properly weigh and evaluate the opinion evidence, and that the decision is therefore unsupported by substantial evidence on the whole record. She also argues that the ALJ should have included additional conditions as severe impairments at Step 2 and considered them in combination with her other impairments in determining the RFC. She asks for reversal and award of benefits.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byers v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A.     Weight given to, and evaluation of, medical opinion evidence

Jacks argues that the ALJ did not properly weigh and evaluate all medical opinion evidence. Specifically, Jacks argue that the ALJ should have given controlling weight to the opinion of her treating neurologist, Dr. Day, whose opinion, Jacks says, is consistent with Dr. Grachek's opinion. Jacks also argues the decision must be reversed because the ALJ "failed to exhibit and consider [the reports of] two consultative examinations" performed by Dr. Israel and Dr. Danushkodi at the request of the state agency.

#### 1. Drs. Day, Gracheck, and Orr

An ALJ must resolve conflicts among medical opinions, including conflicts among treating and examining physicians. *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008); *Estes v. Barnhart*, 275 F. 3d 722, 725 (8th Cir. 2002). An "ALJ is not required to rely entirely on a

13

particular physician's opinion or choose between the opinions [of] any of the claimant's physicians," *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (internal quotation and citation omitted), nor is an ALJ required to give the most weight to the opinion of a treating medical source.

The amount of weight given a treating medical source opinion depends upon support for the opinion found in the record; its consistency with the record; and whether it rests upon conclusory statements. An ALJ must give controlling weight to a treating medical source opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin,* 786 F.3d 1126, 1132 (8th Cir. 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842, 848-49 (8th Cir. 2007)). The opinion may be given "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id.* (citations omitted). But the ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (*quoting Miller v. Colvin*, 784 F. 3d 472, 477 (8th Cir. 2015)).

Here, the ALJ gave little weight to the opinions of Jacks' treating physicians, because the opinions were inconsistent with the record, the treatment notes, the objective evidence of record, and the medical expert's testimony. Dr. Day opined in June 2014 that Jacks was limited to lifting 10 pounds frequently, and 20 pounds occasionally; standing or walking for two hours, and sitting for four hours, in an eight-hour work day; needed to shift between sitting and standing; could only occasionally twist, bend, and climb stairs; should avoid using ladders; and was limited in overhead reaching. Dr. Day further opined that she would have deficits in concentration and persistence, even when performing simple tasks, and would miss more than four days of work per week due to her impairments and needing to obtain treatment for them.

14

But Dr. Day's treatment record does not support such limitations. For example, the same month Dr. Day prepared his opinion, he saw Jacks and noted her vertigo was improved, her headaches were only episodic, and her depression was stable. He noted no limitations of any kind on Jacks' activities. Dr. Day's treatment records does not reflect that Jacks ever visited him as frequently as four times per month, nor reported to him that she had seen another doctor that frequently, nor that she suffered symptoms four times per month of such severity that she was unable to perform activities of daily living and care for her homebound mother. Dr. Day's records never note any assessment indicating any limitations on Jacks' ability to lift, reach overhead, or sit. No testing Dr. Day ever ordered revealed objective findings consistent with his opinion, and he never ordered aggressive or more frequent treatment. Dr. Day even noted in December 2012 that he expected Jacks to improve once her divorce proceedings were concluded, and as noted above, he wrote in June 2014 that her vertigo had improved. The ALJ appropriately gave Dr. Day's opinion little weight.

Likewise, the ALJ appropriately gave Dr. Gracheck's opinion little weight. In early February 2014, Dr. Gracheck opined that Jacks was limited to lifting and carrying less than 10 pounds, and sitting, walking, and standing less than two hours apiece; would need to change positions at will; and should avoid twisting, bending, crouching, and climbing ladders. He opined she would have deficits in attention and concentration, and would miss more than four days of work per month due to her conditions; and was markedly impaired in her activities of daily living, social functioning, and concentration. Two weeks later, Dr. Gracheck opined that Jacks' vestibular problem would never improve.

But as discussed above, Jacks' neurologist, Dr. Day, opined that Jacks' condition would improve and in June 2014, noted it had. Nothing in the record indicates Jacks ever visited Dr. Gracheck or reported to him that she had seen another doctor as frequently as four times per month, nor that she suffered symptoms four times per month of such severity that she was unable

15

to perform activities of daily living and care for her homebound mother. Nothing in the record indicates Dr. Gracheck ever imposed limitations on Jacks' activities, ordered tests that ultimately revealed support for his extreme opinion, or ever ordered aggressive or more frequent treatment. Dr. Gracheck even opined that Jacks was more limited than Dr. Day did. Dr. Gracheck's opinion is inconsistent with Dr. Day's opinion, and with other relatively unremarkable medical findings. The ALJ appropriately gave Dr. Day's opinion little weight.

In contrast, the opinion of Dr. Orr, a neurosurgeon was supported by and consistent with the record. Noting all testing was normal, Dr. Orr opined that Jacks' vertigo was likely related to post-concussion syndrome and not physiological damage, and any physical limitations Dr. Day noted were more related to emotional problems than physical ones. Dr. Orr opined that nothing in the record of physical exam findings supported an inability to walk, or to sit for prolonged periods of time. Dr. Orr opined that overall, nothing in the record supported the extreme limitations that Drs. Gracheck and Day opined were appropriate. Dr. Orr did note that Jacks' episodic dizziness might give Jacks some difficulty with prolonged walking or frequently changing positions.

The ALJ resolved the conflicts among the medical opinion evidence, and formulated an RFC for light work, with limitations including lifting and carrying up to 10 pounds frequently, and 20 pounds occasionally; standing, walking, or sitting no more than six hours in an eight-hour work day; no climbing ladders, ropes or scaffolds; no unprotected heights; and no use of foot controls. The lifting and carrying limitations are the same as those Dr. Day identified, and both Drs. Day and Grachek opined Jacks should not climb ladders. The RFC's limitations on walking and unprotected heights are consistent with Dr. Orr's opinion, which included his recognition of Jacks' episodic dizziness. In short, the ALJ resolved conflicts among the medical opinion evidence, and his decision to give greater weight to the opinion of Dr. Orr and less to the opinions of Drs. Day and Gracheck is supported by substantial evidence on the whole record.

16

### 2. Dr. Israel and Danushkodi

With respect to the opinions of the two non-examining consultants, Drs. Israel and Danushkodi, Jacks states that although the opinions were offered as exhibits and accepted by the ALJ at the February 2014 hearing, they were not included in the list of exhibits attached to the ALJ's decision and the ALJ did not expressly mention them in the decision, nor did Dr. Orr mention them during his testimony. Jacks argues that the ALJ failed to consider the two opinions and that such failure is reversible error.

An arguable deficiency in opinion writing technique is not grounds for reversal when such deficiency had no bearing on the outcome. *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992). Furthermore, reversal is necessary only if the failure prejudices the claimant. *Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007). For example, in *Kaighn v. Colvin*, 13 F. Supp. 3d 1161, 1172 (D. Colo. 2014), the ALJ failed to discuss a doctor's opinion limiting the claimant to use of tools for no more than one hour, and noted problems standing, sitting, lifting, bending, and using the computer. But the ALJ did note that the claimant could not perform repetitive manipulative work or forceful bilateral gripping, and allowed for sedentary jobs in which postural changes were possible. Therefore, the failure to discuss the opinion was harmless error. *See also McFadden v. Astrue*, 465 F. App'x 557, 560 (7th Cir. 2012) (ALJ's failure to consider medical opinion in which doctor determined the claimant was limited in her ability to bend, stoop or climb was harmless error and did not justify reversal; the RFC included postural limitations and those limitations were supported by the record as a whole).

Here, Dr. Israel performed a mental evaluation and opined that Jacks had no mental impairments that would interfere with her ability to work. The RFC imposes no mental limitations, nor does Jacks argue that it should have.

Dr. Danushkodi performed a physical evaluation and opined Jacks had no restrictions in sitting, walking, standing, hearing, speaking, traveling, or vision, and could lift 20 pounds. The

17

RFC imposes greater limitations than those Dr. Danushkodi opined were appropriate. Dr. Danushkodi also opined that Jacks should avoid unsupported heights and climbing, the same limitations imposed in the RFC.

In short, even assuming the ALJ did not consider the two opinions, Jacks was not prejudiced and reversal is therefore not appropriate.

### B.    Severe impairments and the RFC

Jacks argues that in addition to finding severe impairments of degenerative joint disease and degenerative disc disease at Step 2, the ALJ should also have identified post-traumatic vestibular disorder, post-concussive headaches, and non-union fracture of the second metatarsal as severe impairments, and failed to consider the limiting effects of severe as well as non-severe impairments when formulating the RFC. The Commissioner argues they are not severe impairments, but that in any event, the RFC accounts for all impairments and corresponding limitations.

At Step 2, a claimant has the burden of providing evidence of functional limitations in support of her claim of disability. *Baker v. Colvin*, 620 F. App'x 550, 557 (8th Cir. 2015) (citing *Kirby v. Astrue,* 500 F.3d 705, 707 (8th Cir. 2007)). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id.* (citing *Bowen v. Yuckert,* 482 U.S. 137, 153 (1987), and 20 C.F.R. § 404.1521(a)). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of" Step 2. *Id.* (citing *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007)). In *Baker,* for example, the claimant put on evidence that he developed tinnitus due to noise exposure while serving in the Marine Corps in the 1970s. Pointing to the claimant's subsequent 30-year history of steady work notwithstanding the tinnitus, the Eighth Circuit held that the claimant had failed to meet his burden at Step 2 because he failed to show the tinnitus significantly limited or had more than a minimal effect on

18

his ability to work. *See also Domingue v. Barnhart,* 388 F.3d 462, 463 (5th Cir. 2004) (the claimant's failure to contend, at the administrative level, that an impairment is severe, and the lack of evidence of the effect of the impairment on the claimant's ability to work, supported the conclusion that the impairment is not severe).

Furthermore, an impairment may not be severe for purposes of Step 2 when it can be stabilized by medication, no medically necessary restrictions on the claimant's activities are imposed, or when the claimant's daily activities are inconsistent with the claim of severity. *See Johnston v. Apfel,* 210 F.3d 496, 500 (8th Cir. 2000) (alleged impairments are not severe when they are stabilized by treatment and otherwise generally unsupported by the medical record); *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir. 2000) (impairments that are controllable by or amenable to treatment, combined with lack of any medically necessary restrictions on the claimant's activities supported a finding at Step 2 that the impairments were not severe); and *Nguyen v. Chater,* 75 F.3d 429, 430-31 (8th Cir. 1996) (noting, in affirming denial of benefits at Step 2, that the claimant's daily activities—visiting neighbors, cooking meals, doing laundry, and attending church—were incompatible with disabling pain).

Here, the ALJ acknowledged Jacks' diagnoses of post-traumatic headache and vertigo following an assault by her husband in May 2011. But in concluding her headache and vertigo were not severe impairments, the ALJ noted Jacks' November 2011 complaint of vertigo when she got up in the morning and when she went to bed at night, which would not interfere with a normal work shift. The ALJ also noted the absence of any objective findings upon testing: a normal ENG in December 2011; normal MRI of the head in February 2012; negative CT scan of the temporal bones in March 2012; and normal MRI of the head in July 2013. The ALJ further noted the medical expert's testimony that when Jacks was seen for jaw pain by an oral-maxillofacial surgeon in January 2012, there were no findings; she was instructed in 2011 and 2013 to perform exercises for improvement of vertigo, and in 2012 was referred for physical

19

therapy for the same; and testing showed her hearing was good.

Furthermore, the record shows Jacks stopped working in 2009 to care for her homebound mother who had dementia and continued to care for her in and after 2011, and cares for pets, prepares meals, cleans, does laundry, shops, goes to church, and handles her own funds. Jacks was treated conservatively with medications and was given exercises to perform for the vertigo. She admitted to Dr. Day in 2013 that medication helped her vertigo. No doctor has ordered any limitations on Jacks' activities due to headache or vertigo. Jacks continued to drive a car in and after 2011. Her specialists opined that her vertigo would get much better over time, and in June 2014, Dr. Day noted in Jacks' record that overall, her vertigo had improved, and her migraines were stable. At the hearing in February 2014, Jacks did not mention headaches at all.

Jacks' daily activities, including caring for her mother, are inconsistent with her claims of severity; the conditions are stabilized by medication; and no medically necessary restrictions have been imposed on her. Substantial evidence on the whole record supports the ALJ's conclusion that headache and vertigo are not severe impairments for purposes of the determination at Step 2.

Jacks also argues that non-union of her second left metatarsal is a severe impairment. But the ALJ noted Jacks had surgery for hammer toe deformity in December 2012, and that treatment notes from May and June 2013 indicated she was able to walk, wearing a shoe. Furthermore, the record shows Jacks reported to her surgeon in April and May 2013 that her foot was feeling better, and admitted in June 2013 that she had not been regularly using the bone-growth stimulator her doctor prescribed. Nor does Jacks claim to be unable to stand or walk because of the non-union of the metatarsal. At the hearing of February 2014, she simply said she had pain in her left foot and that standing on it for a long period of time made it worse.

Substantial evidence on the whole record, including the improvement in Jacks' condition after the surgery, and her failure to use the device her doctor described during the healing

20

process, supports a finding that the impairment is not a severe impairment for purposes of the determination at Step 2. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (claimant's failure to seek treatment, or to comply with treatment recommendations, supports finding that an impairment is not severe) (and citations therein). *See also Martin v. Colvin,* 2013 WL 4060002, at *20 (W.D. Mo. Aug. 10, 2013) (an "inability to work pain-free is not a sufficient reason to find a claimant disabled") (quoting *Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir. 1988)).[3]

Jacks also argues reversal is necessary because the ALJ failed to consider the combination of her severe and non-severe impairments. To determine whether impairments are of sufficient medical severity, the Commissioner

> [C]onsider[s] the combined effect of all of … impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If [the Commissioner does] find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. …

20 C.F.R. § 404.1523. But only credible limitations need be included in the RFC. *Turpin v. Colvin,*750 F.3d 989, 993 (8th Cir. 2014).

In formulating the RFC here, the ALJ considered severe impairments, as well as non-severe ones including vertigo and non-union of the metatarsal. Based on the record, including objective testing and examinations, doctors' notes, and Jacks' daily activities, the ALJ concluded Jacks' statements concerning the intensity, persistence and limiting effects of her symptoms were

---

[3]  Jacks also states in a footnote of her first brief that the non-union of her left second metatarsal "may meet a listing." [Doc. 17, p. 21 n.22.] To demonstrate an impairment meets a listing, it "'must meet *all* of the specified medical criteria.'" *Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original)). Jacks did not claim below to have met a listing; in her brief pointed to no evidence that she meets one and offered no argument; and in her reply brief was silent on the matter. Jacks failed to bear the burden of demonstrating she meets a listing. *See Reed v. Colvin,* 779 F.3d 725, 725 (8th Cir. 2015) (claimant bears burden of demonstrating all criteria of a listing are met). *See also Vandenboom v. Barnhart,* 421 F.3d 745, 750 (8th Cir. 2005) (holding, "We reject out of hand Vandenboom's conclusory assertion that the ALJ failed to consider whether he met listings 12.02 or 12.05C because Vandenboom provides no analysis of the relevant law or facts regarding these listings.").

not entirely credible, [Tr. 16], a conclusion Jacks does not challenge. The ALJ also considered the opinion evidence, giving great weight to the opinions of the medical expert, and little weight to the opinions of Jacks' treating physicians (as discussed in the preceding section). The ALJ found Jacks could not climb ladders, ropes, or scaffolds, be at unprotected heights, or be around hazards. These limitations are related to post-concussion syndrome and dizziness. Additionally, the ALJ found Jacks could not use foot controls, and was limited to standing and walking no more than six hours in an eight-hour work day. These limitations relate to non-union of the metatarsal. The ALJ considered both severe and non-severe impairments.[4]

Substantial evidence on the whole record supports the ALJ's conclusions concerning severe impairments at Step 2, and the combined effects of severe and non-severe impairments in formulating the RFC.

### III.    Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:   May 2, 2016
Jefferson City, Missouri

---

[4]       As discussed in the preceding section, reversal is necessary only in the case of prejudice. *Samons,* 497 F.3d at 821-22. Jacks' arguments concerning the ALJ's assessment of her vertigo and non-union of the metatarsal also fail because she is not prejudiced. At Step 5, the ALJ concluded Jacks could perform past relevant work including receptionist and switchboard operator jobs, which are jobs existing in significant numbers in the national economy and are classified as sedentary. Sedentary jobs by definition involve sitting, although occasional walking and standing may be required, depending on the job. 20 C.F.R. 404.1567(a), 416.967(a). Jacks does not claim to be unable to walk at least occasionally, and there is no medical opinion in evidence stating that she is unable to do so. The availability of sedentary jobs accommodates Jacks' severe and non-severe impairments, including vertigo and non-union of the metatarsal, and demonstrates Jacks is not prejudiced by the manner in which the ALJ assessed the two conditions at Step 2.